ligently going into the hole, which would exclude any damage which might have arrisen by her afterwards having walked into the hole herself.

Without discussing the question further, we think the law was rightly given on that. The court took the pleadings as he found them and they asked for a joint judgment against all the defendants, and the plaintiff in recovering such a judgment must have recovered it upon the facts set forth in the petition.

We think it sufficient to say we have discussed all the points which have been made by the brief, and have read and re-read this evidence, and we are of opinion that no error appears in the charge of the court, and that the verdict of the jury is sustained by the evidence. The judgment will therefore be affirmed, but without penalty against Schultz.

*Hurd, Brumback & Thatcher*, attorneys for plaintiff.

*Doyle, Scott & Lewis*, attorneys for The Toledo Transfer Companp.

*B. F. Reno*, attorney for George B. Schultz.

*King & Tracy*, attorneys for Washington W. Tryon.

---

## NEGLIGENCE.

[Lucas Circuit Court, October 11, 1893.]

### The L. S. & M. S. Ry. Co. v. Ney.

Bentley, Haynes and Scribner, JJ.

RAILWAY COMPANY NOT RESPONSIBLE WHERE THERE IS NEEDLESS VIOLATION OF ITS RULES.

> A railway company is not responsible for accidents which are the immediate result of a needless violation of its rules, as where a brakeman in coupling cars, used his hands instead of a stick, the latter method being required by the rules, and it appearing from the evidence that the coupling could have been easily made with a stick.

ERROR to the Court of Common Pleas of Lucas county.

BENTLEY, J. (orally).

This case is before us upon a petition in error to reverse the judgment of the court of common pleas, rendered upon a verdict returned by the jury in favor of Mr. Ney, and against the railroad company, for alleged personal injuries received by Mr. Ney about December 11, 1890, in the Lake Shore yards.

The plaintiff alleged in his petition that at the time of, and before the injury to him, he was in the employ of the defendant in the capacity of a switchman or helper, that it was his duty, under the directions of the pony conductor, to assist in switching and coupling and uncoupling cars, in making up trains for the defendant; and that on December 11, 1890, about 9 o'clock in the evening, he was engaged in that work under the orders of what is called a pony conductor in the employ of the defendant, and that he was bound to obey the orders of the conductor. "That at, or about that time the said pony conductor directed that an engine with ten freight cars should proceed in a northerly direction over the said scale track to a box car that lay near the said scale, and that the said car should be coupled to the said train of cars, and taken by it from the said scale track to some other track, there to become a part of a train

that was being or about to be made up." The plaintiff says, that "in obedi-
ence to said order, the engineer on the said pony engine pushed the said
train of about ten cars back over the said track in a northerly direction,
toward the said freight car that was standing near or on the said scale;
that as the train of said cars approached the said box car, it became the
duty of the said plaintiff to pass between the end of the said train and
the said box car, and make the coupling; that he did go between the
said car and said approaching train, and when the said train of cars were
about to strike against the said car, he endeavored to couple the same,
but failed, for the reason that there was some defect in the drawbar on
the north end of the northerly car of said approaching train. That when
the said train struck the said box-car, the said box-car was driven by the
concussion about a car length north of the said train on an up-grade.
The said plaintiff thereupon signalled the pony conductor to hold the said
train at a stand-still, in order that he might safely make the coupling
when the said car returned, as it was certain to do, by reason of the
down-grade. This plaintiff says that at the time he gave the signal to
stop the train, the pony conductor was standing near the engine, in full
view of plaintiff's lamp, and saw, or by the use of reasonable care might
have seen, the said signal; that the engineer, in obedience to the said
signal, did stop the said train; that plaintiff adjusted the drawbar by
raising it and bracing it with a small piece of coal, and so adjusted it that
the coupling could be made without difficulty when the said car should
return, and thereupon waited for said car, and when the said car re-
turned, as it did, on the said down-grade to the place where plaintiff was
standing at the end of said train, the said plaintiff undertook to make
the coupling—all of which was known, or by the use of reasonable care
might have been known, to said pony conductor. And that while he
was so engaged in the work of coupling the said box-car to said train of
cars, the said pony conductor carelessly, wrongfully, and negligently
signalled the engineer on the said engine to start his said engine rapidly
forward; the engineer in obedience to said signal did start the said
engine rapidly forward, and thereby the said ten cars were driven rapidly
and violently against the said box-car that the plaintiff was endeavoring
to couple to this train, whereby, without any fault on the part of this
plaintiff, but entirely by the reason of the negligence of the said pony
conductor in giving the said signal to the engineer to start his engine as
aforesaid, plaintiff's right hand was caught between the drawbars of the
two cars he was endeavoring to couple, and crushed and mangled in such
a manner that the greater part of it was afterwards necessarily ampu-
tated," to his damage in the sum of $15,000.

As has been said, the case was tried to a jury and the questions pre-
sented to us arise upon the facts as presented by the bill of exceptions,
there being a motion for a new trial, which was overruled, and exceptions
taken. The question of the effect of this testimony, as bearing upon the
issues, is presented to us, whether it afforded the jury any reasonable
ground for the verdict in favor of the plaintiff.

The particular facts bearing especially upon the accident are some-
what simple. The situation of the cars is detailed in the petition, and
the movements that were going on. There was testimony given to the
effect that one of the cars in question was equipped with what is called an
Eames coupling apparatus, and a similar apparatus, one of the Eames coup-
lers—drawbars—has been brought in and exhibited, for the informa-
tion of the court, that we may see to what the testimony applies. There

was some confusion in the testimony as to where this Eames coupler was—that is, whether it was upon the end of the car which was already attached to the engine—one of the ten cars that were being moved by the engine—or whether it was attached to the stationary car to which these cars were to be coupled. There seemed to be more or less confusion all the way through the case, in the examinations at least, as to what the fact was, and there seems to be a controversy between the attorneys even now as to what the real fact was. But there was, substantially, a conflict of testimony regarding this matter. The testimony given on behalf of the plaintiff, and by the plaintiff, was finally, we think, clearly to the effect that the Eames coupler, which bore the link to be used in the particular coupling, was upon the car to which the train was to be coupled, and that the other draw-bar complained of—the standard Lake Shore drawbar—was attached to the last of the ten cars already attached to the engine, and which was to be attached to this Eames coupler, the pin to be dropped in place being upon the standard Lake Shore drawbar. The testimony on behalf of the railroad company tends to show the reverse of the situation, namely : that the Eames draw-bar was attached to the last of the ten cars already to attached to the engine, and not upon the other car. Although some argument was founded upon that, there is substantially a conflict of testimony in the matter, and it would be utterly impossible for this court, were we so disposed, to say from this record as to which party was in the right as to the fact. But in our view of the case it makes no substantial difference whether this Eames drawbar was upon one of those cars or the other. The real controversy in the case arises over another question.

The controversy of fact which was presented between the plaintiff's proof and that of the defendant was over the question whether the signal to go ahead, complained of in the petition, was given by the plaintiff himself or by the pony conductor, to the engineer. There seems to be no question but that the engineer received a signal from somebody to go ahead, and obeyed it, starting the cars, according to all of the testimony on both sides, very slowly, but starting them. The plaintiff says in his petition, and also in his evidence given upon the trial, that when the cars first came together and he endeavored to make the coupling, he discovered that the Eames drawbar was from an inch and a half to two inches higher than the other drawbar, so that the link did not readily enter, and that by the first impact of the ten cars upon the stationary car, the stationary car was driven to the north, and thereupon the plaintiff got a piece of coal, raised up the drawbar of the standard Lake Shore car, and, as he says in his petition, "so adjusted it that the coupling could be made without difficulty when the said cars should return." His petition says that that was the situation of affairs at the time the last attempt to couple was made, viz : that he had so adjusted the Lake Shore drawbar that it was upon the same plane as the other, and the coupling could be made without difficulty. He says in his testimony that that was true.

There is no question made that there was any defect in either of these drawbars. The simple fact was that one was from an inch and a half to two inches lower than the other ; but that was frequently the case, perhaps, with different cars that go to make up a train.

The plaintiff says that when this stationary car had thus been driven back, and he had adjusted this drawbar so that the coupling could be made without any difficulty, instead of holding the train still, and allowing

him to wait for the return of that car, on account of the down-grade, and to make the coupling in that way, the engine started northerly towards the car, which had thus been driven up the track, and that this movement occurred just about the time that the car had returned and he was actually manipulating the link to make the coupling, and that thereupon the heads of the drawbars coming together quicker than he anticipated, his hand being in there, it was caught and crushed.

The negligence which the plaintiff complains of against the defendant is simply in starting this train in that way, under those circumstances. The defendant claims, in addition to its claim that the conductor gave no signal, that Ney himself had given the signal and that the train was backing all the while in obedience to his signal, that the man was guilty of misconduct and negligence himself, in this: when he was employed by the company, he received a printed copy of the rules together with certain instructions therein; that he had them in his possession, and that he was aware of their contents. One rule required the switchman, or any person attempting to couple cars, to do it with a stick, and not to use the hand for the purpose of guiding the link except in cases where it was necessary—that is, in cases, as the rule says, where a stick could not be used for the purpose. The plaintiff testified that he had received and knew of that rule; that he din't use a stick, that he did use his hand, and that the injury occurred substantially as we have said. The company gave testimony, and it was not disputed, so far as that fact goes, that sticks were prepared for his use, which he might have obtained and used; that the rule required him to furnish himself with a stick, yet the company furnished it; all he had to do was to go and get it. He attempted to give testimony several times to the effect that although this rule was nominally a rule of the company, yet the rule was not in force; that it was not the habit of brakemen generally to use a stick; that the coupling was almost uniformly made by the hand in the presence of the officers and superior agents of the company; and that thereby the rule should not be allowed to figure in determining this case, or in determining the character of his action in using his hand. Whether right or wrong, as the questions were presented at various times during the trial, the court of common pleas uniformly excluded that testimony, and it was not given. So that the question finally presented to the jury rested upon the general facts of the case, with that rule in force, and with the confession of the plaintiff that he did not use his stick, but that he used his hand.

It will be seen, then, that the real question—the final controversy which the jury were called upon to decide, in view of the charge of the court upon the effect of that rule, was, whether or not that was an occasion where this rule required the use of the stick or not; or perhaps, to state it a little more liberally: this was given to the jury as a question of fact whether or not, in the exercise of reasonable judgment upon the part of the switchman, when he was attempting that coupling, in view of the situation and circumstances, he should have been required to use his hand, or whether it was an occasion where he should not use his hand, but should use a stick. The jury found that it was proper for him to use his hand, apparently—that is necessarily the conclusion from their verdict; and the question presented to us is, whether they had a right to so find from this testimony.

The plaintiff says in his testimony, upon pages four and five, in answer to questions :

"Go on and tell the jury just what you did.  A.  I went back and made the three couplings, and came to this Eames coupling.  The car stood about three car lengths south of the scale track.  I tried twice to couple it, but couldn't make it.  I put a little lump of coal under the drawbar, and could make the coupling all right.  The track kind of descends down, kind of step down on a small slope like—went in and put a little lump under there, and set the pin.

"Q.  When you gave them a signal to stop, what happened?  A. It brought them right to a stand-still, and stopped.

"Q.  Was it after they stopped that you put in this piece of coal, or before?  A.  I had the lump of coal before he stopped.  The car came moving along down.  I made the coupling all right.  Just as I went to pick up the link to enter into the drawbar, the engine came ahead on me, and caught me."

I have marked in the record the testimony bearing upon this matter—the necessity of using the hand on such an occasion as here presented.  Perhaps I ought not to take the time now to turn to that, but to state substantially all the proof upon that subject.  The defendant had various witnesses who testified that the coupling could be made with a stick.  The plaintiff had some one or two, possibly three, witnesses, who gave testimony upon this subject, and in the course of their testi- mony they said substantially, one could not couple an Eames drawbar or link with a stick.  Upon inquiry as to why that could not be done, they simply gave this reason : that where the drawbar of the other car, into which the link was to be entered, was from one and a half to two inches higher than the Eames drawbar, the link, or bull-tongue, as it is called, is so heavy that a person could not raise it sufficiently with a stick in his hand, but must take it in his hand to raise it to the same plane, so it would enter.  It was proven, substantially without any contra- diction, and by witnesses on both sides, that where it was simply necessary to depress the link of the Eames drawbar, it could be depressed three or four inches by a pressure upon the top of it ; that generally it was supposed to be upon almost on a poise, but the back end being a little heavier, it was not quite on a poise, but that a slight pressure upon the top of the link would depress it three or four inches.  And this is illustrated by what has been brought here, that that can be done very readily and very easily, upon a very slight pressure.  There was no suggestion by anybody that there was any difficulty in making a coupling where the drawbars were substan- tially upon the same plane ; there was no suggestion of any difficulty sometimes occurring where one of the drawbars was on one side of the other—where they didn't come face to face ; the only suggestion of diffi- culty is, when, not the Eames drawbar, but the other, is an inch and a half to two inches higher than the other.  Where the Eames drawbar is the higher, if they had not been brought to the same plane, the proof is, that by a slight pressure, even by a stick or anything, the Eames draw- bar could have been depressed, and the entry could have been made.  But even that situation is not placed before us in this record, for when the accident occurred, and the coupling was about to be made, it is the undisputed proof—the claim of the plaintiff in his petition and in his testimony—that the drawbars were upon the same plane, and that the coupling could be made without any difficulty whatever.  There is the situation : the coupling could be made without any difficulty whatever, and without danger, by the use of a stick.  The stick could have been used.  The plaintiff knew of the rule, and he chose to disobey it.

In those circumstances, we see no escape from the conclusion that the jury were not warranted in finding that the defendant was not called upon to use a stick, and that it was perfectly right for him to use his hand. And it being perfectly manifest that the accident occurred simply because he did use his hand, and not a stick, we are compelled to say that the verdict is not sustained by the evidence. There is not a conflict of evidence, but the concurring testimony of all persons upon the facts that bear upon the real controversy, shows that the verdict is not sustained. In deciding this, we do not mean to say that the rulings which the court made against the plaintiff as to the admission of testimony about using a stick or using the hands were right or wrong. Whatever testimony might have been given upon that subject was excluded by the court. We decide the case upon the record as it is here presented to us.

This verdict will therefore be set aside, and the judgment reversed, and the cause remanded to the court of common pleas for a new trial.

Judgment against the defendant in error for costs on error.